HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED TRANSPORTATION UNION,
and RICHARD D. KITE,

               Plaintiff,

     v.

BNSF RAILWAY COMPANY,

               Defendant.

CASE NO. C10-5808RBL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I. FINDINGS OF FACT

1.      Defendant BNSF Railway Company ("BNSF") is a carrier by rail as defined in

the Surface Transportation Act, 49 U.S.C. § 10102, and a carrier as defined in Section 1, First of

the Railway Labor Act ("RLA"), 45 U.S.C. § 151, First.  BNSF is headquartered in Fort Worth,

Texas and operates a rail transportation system in interstate commerce, including in the State of

Washington.

2.      Plaintiff United Transportation Union ("UTU") is a labor union and the duly

designated representative, as defined in Section 1 First of the RLA,  45 U.S.C. § 151, First, of the

craft or class of conductors employed by BNSF.  The UTU is a party to various collective

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 1

1  bargaining agreements with BNSF that govern rates of pay, rules and working conditions for

2  conductors, including the rules that govern employee discipline and grievance handling.

3      3.      General Committee of Adjustment GO-386 is a subordinate committee of UTU

4  that represents BNSF employees in and around the State of Washington.  Among its

5  responsibilities, GO-386  processes grievances on behalf of the employees it represents,

6  including grievances challenging disciplinary decisions by BNSF.  The chairman of GO-386

7  during the relevant time period is Jay Schollmeyer.

8      4.      Plaintiff Richard Kite is a former employee of BNSF.  He worked as a conductor

9  in Washington State and was represented by the UTU.

10  **B.    The Origin of the Parties' Dispute**

11

12      5.      On the morning of January 17, 2005, Mr. Kite was subject to a random alcohol

13  test conducted by BNSF when Mr. Kite reported for service on a train traveling from Pasco,

14  Washington to Vancouver, Washington.  Mr. Kite's initial test registered a blood alcohol level of

15  0.029 percent, and second test 20 minutes later registered a blood alcohol level of 0.027 percent.

16      6.      Under BNSF's zero tolerance policy guidelines, a blood alcohol level above 0.020

17  is considered a positive test.  In accordance with the collective bargained rules governing alleged

18  violation of company policies, BNSF scheduled a disciplinary investigation, which took place on

19  February 25, 2005.

20      7.      At Mr. Kite's subsequent disciplinary hearing, BNSF introduced evidence that the

21  January 17 test was Mr. Kite's second alcohol policy violation.  He had previously tested

22  positive for alcohol on May 5, 1997, as evidenced by a January 19, 2005 letter from Martin

23  Crespin, Manager of Medical Support Services for BNSF to Ken Iverson, Director of

24

1  Administration, NW Div., BNSF:   "This employee previously confirmed positive for alcohol on

2  test date May 5, 1997." Exh. 48, p. 40.

3        8.       On August 25, 1997, Mr. Kite acknowledged that his employment was subject to

4  a variety of conditions over the next ten years:

5              a.      A repeat positive alcohol test and/or drug test for controlled substances

6        obtained under any circumstances.

7                    THOSE EMPLPOYEES WHO HAVE TESTED POSITIVE IN THE
                     PAST TEN (10) YEARS WOULD BE SUBJECT TO DISMISSAL
8                    WHENEVER THEY TEST POSITIVE A SECOND TIME.

9  Exh. 48, p, 109.

10        9.       BNSF permanently dismissed Mr. Kite from employment on March 7, 2005.

11        10.      Under the parties' collective bargaining agreement, challenges to disciplinary

12  decisions must be processed through a series of appeals to progressively more senior carrier

13  officers.  After Mr. Kite's dismissal, the UTU appealed in "the usual manner," culminating in an

14  appeal to the highest carrier officer designated to handle such disputes.  BNSF denied the UTU's

15  appeals by direct reference to Kite's second violation of Carriers Drug and Alcohol Policy.

16  Exh. 45, p. 17.

17  **C.   Public Law Board 7204**

18        11.      The RLA provides that if a grievance is not resolved by agreement through the

19  "on-property" (at the work place level of decision-making) process described above, it may be

20  submitted by either party to arbitration.  45 U.S.C. § 153.  A dispute may be referred to the

21  proper division of the National Railroad Adjustment Board ("NRAB"), 45 U.S.C. § 153 First, or

22  the parties may agree to establish a "special board of adjustment," also known as a public law

23  board ("PLB"), 45 U.S.C. § 153 Second.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 3

1    12.    Because Mr. Kite's case was not "resolved" by agreement through the on-

2    property process, it was appealed to arbitration.  The matter was assigned to PLB 7204, a special

3    board of adjustment that had been established by agreement of the parties on April 21, 2008.

4    The parties' arbitration agreement provided, among other things, that "[t]he parties may present,

5    either orally or in writing, statements of fact, supporting evidence and data, and argument with

6    regard to each case being considered by the Board.  The Board shall have authority to request the

7    production of additional evidence from either party."  Exh. 2.

8    13.    PLB 7204 had three board members—two partisan members and a neutral.  The

9    partisan members—one from the carrier and one from the union—are expected to act as

10   advocates for their respective side.  The carrier's partisan representative was Roger Boldra.  Mr.

11   Boldra was a labor relations officer with BNSF, who at the time had responsibility for the

12   portion of the railroad covered by GO-386.  The union's partisan representative was Mr.

13   Schollmeyer.  The two partisan participants selected Jacalyn Zimmerman as the neutral member.

14   14.    PLB 7204 heard Mr. Kite's appeal on July 31, 2008.  The three board members

15   held a private executive session to discuss the case.

16   15.    At the hearing, Mr. Schollmeyer argued that Mr. Kite's dismissal discipline

17   should be overturned, and Mr. Boldra argued that it should be upheld.  No one disputed that Mr.

18   Kite was guilty of an earlier offense in 1997.  Likewise, neither of the written appeals submitted

19   by UTU during "on-property handling" asserted that Mr. Kite had only one offense; both appeals

20   instead argued that the breathalyzer results were "unreliable."

21   16.    The participants disagree about whether they discussed settlement of the case

22   during the  executive session.  Mr. Boldra contends that he never offered to settle the matter, but

23   rather stated that if Mr. Kite were put back to work against BNSF's wishes, it would have to be

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 4

1    subject to various conditions.  Ms. Zimmerman came away from the executive session with the

2    impression that the parties had tentatively agreed to settle the case, so long as the award did not

3    undercut BNSF's position that a two-time offender could not be put back into service.

4              17.    Ms. Zimmerman proceeded to draft an award that reflected what she believed to

5    be the parties' tentative settlement.  Because it reflected a settlement, the draft was not based on

6    her own views of the case.  She did not make any factual findings.  She testified credibly that had

7    she ruled on the record, she would have found in favor of BNSF, and upheld the discharge of Mr.

8    Kite.

9              18.    Ms. Zimmerman prepared her draft award on November 7, 2008.  It was sent to

10   the parties by email on December 22, 2008.  It concluded that Mr. Kite was guilty of an alcohol

11   violation on January 17, 2005, but that there was no proof in the record of the 1997 violation,

12   and that Mr. Kite should therefore be treated as a first-time offender.

13             19.    Ms. Zimmerman's understanding and intent was that the document she issued to

14   the parties was just a draft, and nothing more.  This was so because she understood that any

15   settlement between the parties was not yet final, and was subject to review and approval of the

16   draft award.  Consistent with industry practice, because the document was just a draft, she did

17   not sign it.

18             20.    The UTU also referred to the December 22, 2008 document as a "draft."  Mr.

19   Schollmeyer understood that the draft was "never out there to be signed."

20             21.    On January 8, 2009, Mr. Boldra sent an email to the other two board members

21   requesting a second executive session to discuss the draft award.  The executive session was held

22   by conference call on or about February 20, 2009.

23

24

1    22.    During the second executive session, Mr. Boldra denied that he had agreed to

2    settle the Kite case, and he asked Ms. Zimmerman to set aside her notes to that effect and decide

3    the case on the merits.  Mr. Schollmeyer insisted that Mr. Boldra had agreed.  The conversation

4    became heated.  Mr. Schollmeyer demanded that Ms. Zimmerman sign and issue the draft award.

5    23.    Because of the tone of the conversation and the parties' entrenched positions, Ms.

6    Zimmerman began to feel that her appearance of impartiality had been compromised. She

7    realized that if there were no settlement, then she would have to go back and issue an award

8    based on the record.  She thought that Mr. Schollmeyer, in particular, was not going to accept a

9    different award as fair and impartial, given that it would not be in his favor.

10    24.    At some point during this executive session, Mr. Boldra stated that putting a two-

11    time offender back to work would create an "emotional reaction" at BNSF.  He said words to the

12    effect that if you're going to issue an award like this, you will never work for a Class One

13    railroad again.

14    25.    Ms. Zimmerman did not perceive Mr. Boldra's comments as a threat of economic

15    retaliation.  She understood that there is a very firm industry rule that two-time offenders should

16    not be put back to work, and she agrees with that principle. Indeed, she would have followed that

17    rule and upheld Mr. Kite's discharge in this case, and had not done so only because she thought

18    the parties had a tentative settlement.  Thus, she did not feel threatened in any way by Mr.

19    Boldra's comments.

20    26.    At the end of the conversation, Ms. Zimmerman told the parties that she would

21    have to consider what she was going to do.

22    27.    Ms. Zimmerman recused herself within a matter of days.

23

24

1    28.    Ms. Zimmerman did not recuse herself because she felt threatened with economic

2    retaliation by Mr. Boldra.  She recused herself solely because she was concerned that her

3    appearance of impartiality had been compromised, because she could not issue a draft award

4    based on a non-existent settlement, or go back and rule on the record evidence, which would

5    have resulted in a decision in BNSF's favor.

6    29.    Following the executive session, Mr. Schollmeyer did not complain about threats,

7    coercion, or extortion to Ms. Zimmerman, Mr. Boldra's superiors at BNSF, the NMB, or anyone

8    else.

9    30.    Several months later, Ms. Zimmerman ceased her arbitration practice in order to

10   take a job with the State of Illinois.  Her decision to do so was unrelated to the Kite case.

11   **D.    Reassignment of the Case**

12   31.    After Ms. Zimmerman told the parties that she was recusing herself, Mr. Boldra

13   and Mr. Schollmeyer mutually agreed to move Mr. Kite's case to another, existing public law

14   board—PLB 7254, which was chaired by neutral Robert Peterson.  Roland Watkins is the

15   Director of the National Mediation Board (NMB).  NMB funds the work of the neutrals in the

16   Public Law Boards.  His assistant is Carol Conrad.

17   32.    On February 27, 2009, Mr. Boldra sent a letter to the NMB asking to add the Kite

18   case to the docket of PLB 7254.  His purpose in doing so was to ensure that Mr. Kite's case

19   would be resolved.  Mr. Schollmeyer did not object or otherwise oppose Mr. Boldra's request for

20   a transfer to PLB 7254.

21   33.    On March 3, 2009, Mr. Schollmeyer sent a letter to the NMB stating that he had a

22   "concern that the NMB might not provide funding to have this case heard on Board 7254 and

23   [we might] never get an award issued on this case."  Mr. Schollmeyer's purpose in sending this

24   letter was to urge the NMB to allow Mr. Kite's case to be heard by PLB 7254.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 7

1    34.    On March 13, 2009, Carol Conrad sent an email to Messrs. Boldra and

2    Schollmeyer explaining how the parties should go about getting the Kite case transferred from

3    PLB 7204 to 7254.  Mr. Schollmeyer did not object to Ms. Conrad's email or otherwise

4    complain that the transfer was improper.

5    35.    On March 17, 2009, Mr. Boldra wrote to Ms. Conrad, asking that the Kite case be

6    removed from PLB 7204.  In a cover email to his letter, Mr. Boldra stated "[a]ll parties have

7    agreed to this move." Mr. Schollmeyer was copied on both the letter and the email.  Again, Mr.

8    Schollmeyer did not object or otherwise state that he opposed the transfer.

9    36.    On March 26, 2009, Mr. Watkins approved the addition of the Kite case to PLB

10   7254.  However, on March 31, 2009, Watkins issued a letter denying the parties' request to

11   remove the Kite case from PLB 7204.  On April 6, 2009, Watkins reiterated that he was

12   rescinding his approval of the request to add the Kite case to PLB 7254.

13   37.    Mr. Watkins' sole reason for refusing the reassignment was a concern about

14   funding.  Because the NMB policy was to pay arbitrators when they issue a draft award, Ms.

15   Zimmerman had already received a payment for the Kite case.  The NMB did not want to pay for

16   the same case to be handled again, even if that meant that the grievance would remain

17   unresolved.

18   38.    After receipt of Mr. Watkins' letter refusing the reassignment on April 6, Ms.

19   Zimmerman exchanged a series of emails with Messrs. Schollmeyer and Boldra about the matter.

20   Ms. Zimmerman offered to assist with getting the case transferred by calling Mr. Watkins.  She

21   did so because of her conviction that Mr. Kite needed an opportunity to get his grievance heard

22   and decided on the merits.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 8

39.     On April 17, 2009, Ms. Zimmerman, Mr. Schollmeyer and Mr. Boldra had a conference call.  The purpose of the call was to discuss the logistics of getting the Kite case transferred to PLB 7254.  As during the previous discussions, Mr. Schollmeyer did not object to the transfer.

40.     On April 20, 2009, Ms. Zimmerman issued a one page order, stating that the Kite grievance was "dismissed without prejudice."  She did so in order to assist the parties in their efforts to get the case re-assigned and resolved.  Again, Mr. Schollmeyer did not object.

41.     In addition to his conversations with Ms. Zimmerman and Mr. Schollmeyer, Mr. Boldra also spoke with NMB staff about Mr. Watkins' refusal to reassign the case.  They advised him that the problem was that the NMB system would not accept a case with the same file number, and so advised him to change the carrier file identification number.  Mr. Boldra did so.

42.     On April 30, 2009, Mr. Boldra renewed his request to add the Kite case to PLB 7254 with a new file number.  Mr. Schollmeyer did not object.

43.     On May 1, 2009, the NMB granted the request to add the Kite case to PLB 7254.  Schollmeyer Dep. Ex. 25.  Again, Mr. Schollmeyer did not object.

**E.   Public Law Board 7254**

44.     Public Law Board 7254 was a standing board of arbitration that had been established by agreement between BNSF and the UTU.  The arbitration agreement had the same rules regarding the submission of evidence as the agreement establishing PLB 7204.

45.     After the Kite case was transferred to PLB 7254, each party filed a written submission.  Mr. Schollmeyer prepared the submission on behalf of Mr. Kite.  That submission consisted of the same submission that UTU had filed before PLB 7204, with the addition of one page of new argument.  In his new argument, Mr. Schollmeyer outlined the procedural history of the Kite case, conceding that the original Zimmerman award was just a "draft."  He did not

1   argue that the procedures used to effectuate the transfer were improper. Nor did the submission

2   mention any alleged threats, extortion or coercion.

3       46.     On November 13, 2009, the parties held a hearing on the Kite case before PLB

4   7254.  The participants were Mr. Boldra, Mr. Schollmeyer, and Mr. Peterson (the neutral chair).

5       47.     During the proceedings before PLB 7254,  Mr. Schollmeyer did not object to PLB

6   7254's consideration of the Kite case.  Nor did Mr. Schollmeyer ever assert or otherwise claim

7   that Mr. Boldra had threatened Ms. Zimmerman or that Ms. Zimmerman's recusal had been

8   procured by coercion or extortion.  Mr. Schollmeyer did not mention his allegations of extortion

9   to Mr. Peterson until "long after" the Peterson Award had been issued.

10      48.     Mr. Schollmeyer's contrary assertion that he verbally raised the matter with Mr.

11  Peterson during the hearing on Mr. Kite's grievance is not credible and is contradicted by the

12  testimony of both Mr. Boldra and Mr. Peterson.   It is also not credible in light of the fact that

13  Mr. Schollmeyer admits that he never made an effort to document something as serious as a

14  charge of extortion by a carrier representative.

## II. CONCLUSIONS OF LAW

**A.    Plaintiffs Have Failed to Prove Corruption**

17      1.      This Court has jurisdiction in this case pursuant to Section 3 First (q) of the RLA,

18  45 U.S.C. § 153 First (q), and 28 U.S.C. §§ 1331, 1337.

19      2.      Boards of arbitration under Section 3 of the RLA have exclusive jurisdiction over

20  grievances and disputes over interpretation or application of collective bargaining agreements

21  (so-called "minor disputes").  *Gunther v. San Diego & Arizona Eastern Ry.*, 382 U.S. 257, 261-

22  62 (1965).

23      3.      Congress intended that arbitral awards under the RLA would be "final and

24  binding."  45 U.S.C.§ 153(m).   In order to ensure such finality, Congress strictly limited the

1  ability of railroads and employees to challenge RLA arbitration awards in court. *Union Pacific*

2  *R.R. v. Sheehan,* 439 U.S. 89, 91 (1978); *Slocum v. Delaware, Lackawanna & W. R.R.*, 339 U.S.

3  239, 243-44 (1950).

4      4.    Accordingly, the standard of judicial review of arbitration awards under the RLA

5  is "among the narrowest known to the law." *Sheehan*, 439 U.S. at 91.  Under § 3 First (q) of the

6  RLA, arbitration awards by the NRAB are "conclusive on the parties" and may be set aside only

7  "for failure . . to comply with the requirements of this chapter, for failure of the order to

8  conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud

9  or corruption by a member of the division."  45 U.S.C. § 153 First (q).  The same standard

10  applies to review of award by boards established under § 3 Second of the RLA.  *United Transp.*

11  *Union v. Indiana Harbor Belt R.R.*, 540 F.2d 861, 863 (7th Cir. 1976).

12      5.    In this case, the only claim under § 3 First (q) of the RLA stated in Plaintiffs'

13  Petition is a claim of "corruption."  Plaintiffs contend that BNSF, through Mr. Boldra, engaged

14  in corruption in two respects:  (a) by "threatening Referee Zimmerman with economic ruin in

15  retribution for her decision in the November 7, 2008 award," and (b) by re-listing the Kite case

16  under a different File Number with PLB 7254.  They also contend that Ms. Zimmerman engaged

17  in corruption by issuing her April 20, 2009 award dismissing Mr. Kite's grievance.  They further

18  contend that Mr. Peterson engaged in corruption by agreeing to add Mr. Kite's case to PLB

19  7254, "reviewing Zimmerman's November 7, 2008 decision, and then reversing that decision

20  and sustaining Kite's permanent dismissal."

21      6.    In order to protect the strong interest in finality in RLA arbitration, "the definition

22  of corruption under the RLA encompasses only serious misconduct--i.e., conduct of the sort that

23  would justify vacatur of an NRAB decision."  710 F.3d at 931.  "Arbitration omits many of the

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 11

niceties of federal courts, and 'whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so.'" *Id.* (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas,* 915 F.2d 1017, 1022 (5th Cir. 1990)).

7.      Accordingly, corruption under the RLA encompasses only three categories of conduct.  "First, corruption includes acts that threaten the integrity of arbitral proceedings that are either quasi-criminal or criminal in nature, including, but not limited to, acts of violence or threats thereof.  Second, corruption encompasses acts of bribery and extortion that threaten the integrity of arbitral proceedings, the latter of which includes, but is not limited to, threats of economic injury. Third, corruption extends to similarly egregious abuses of office that threaten the integrity of arbitral proceedings." 710 F.3d at 932.  These categories should be narrowly interpreted when considering whether particular acts constitute corruption.  *Id.*

8.      In order to ensure that RLA arbitration awards "maintain the presumption of finality that Congress intended," any allegation of corruption "must be proven by clear and convincing evidence." *Id.*  A requirement of proof by "clear and convincing" evidence is a "heavy burden," which is "far in excess of the preponderance sufficient for most civil litigation." *Easterwood v. National Enquirer,* 123 F.3d 1249, 1252 (9th Cir. 1997) (quoting *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985)); *see also Colorado v. New Mexico,* 467 U.S. 310, 316 (1984)  (noting that to be "clear and convincing," evidence must "place in the ultimate fact finder an abiding conviction that the truth of its factual contentions are 'highly probable.'").

9.      In this case, Plaintiffs have failed to show "corruption," as defined by the Ninth Circuit, by clear and convincing evidence.  This is so for several reasons.

1           10.    First, the record demonstrates that Mr. Boldra did not, in fact, threaten Ms.

2 Zimmerman in any way.  Mr. Boldra's statements during the executive session about arbitrators

3 "working for a Class I railroad" were merely an attempt to remind Ms. Zimmerman of the

4 importance of the industry principle that employees who are found guilty of a second drug or

5 alcohol violation should not be put back to work.  Ms. Zimmerman understood and fully agreed

6 with the point that Mr. Boldra was making.  Accordingly, she is entirely credible in testifying

7 that she did not view his statements as a threat of economic retaliation.

8           11.    Second, Mr. Boldra's statements were not the cause of Ms. Zimmerman's

9 decision to recuse herself. Ms. Zimmerman recused herself because both parties were so

10 vehement and unyielding in their positions that she could no longer issue an award while

11 maintaining an appearance of impartiality. She believed, in particular, that she could not issue a

12 new award based on a review of the record because Mr. Schollmeyer would not accept such an

13 award as fair and impartial, in light of her draft award.

14           12.    Third, there was no prejudice to Mr. Kite as a result of Ms. Zimmerman's recusal

15 or PLB No. 7204's failure to issue the November 7 draft award.  The unsigned draft was not, in

16 fact, an actual award in Mr. Kite's favor.  Rather, it was only a draft settlement, reflecting the

17 terms that Ms. Zimmerman believed the parties had tentatively agreed to, subject to review and

18 approval of the draft by both sides.  Had Ms. Zimmerman ruled on the merits of Mr. Kite's

19 claim, she would have ruled in favor of BNSF.  Her testimony on this point is credible and is not

20 contradicted by anything in the record.  Given that Mr. Kite would still have lost if Ms.

21 Zimmerman had not recused herself, the recusal did not alter the ultimate outcome of the

22 proceedings in any meaningful way, and thus did not "threaten the integrity of arbitral

23 proceedings."

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 13

13.     For the same reasons that Ms. Zimmerman's recusal was not procured by or fairly characterized as "corruption," her subsequent April 20, 2009 order of dismissal was similarly not corrupt.  Ms. Zimmerman was entitled to recuse herself when she felt that her appearance of impartiality had been compromised, and the order of dismissal merely formalized that decision. Moreover, she issued the dismissal order to assist the parties in their efforts to transfer the case to another PLB for resolution, which was a legitimate reason to issue such an order.

14.     The parties, specifically Mr. Boldra and Mr. Schollmeyer, agreed to transfer the case to PLB 7254 after Ms. Zimmerman had recused herself.  Mr. Schollmeyer actively participated in the process of trying to get the case transferred, and urged the NMB to provide funding.  Given that the parties jointly requested that PLB 7254 hear Mr. Kite's case, the efforts of BNSF or Mr. Boldra to secure or effectuate that transfer cannot be deemed "corruption."

15.     In particular, Mr. Boldra's actions in changing the carrier file numbers for the Kite case in order to secure a transfer to PLB 7254 cannot be characterized as corruption.  Such minor ministerial acts, even if unauthorized, would not rise to the level of "quasi-criminal or criminal" acts, extortion or bribery, or a "similarly egregious" abuse that threatens the integrity of arbitral proceedings.

16.     In any event, Mr. Boldra credibly testified that he was instructed to change the file numbers by NMB staff, and was therefore authorized to do so by the federal agency that administers the RLA arbitration process.

17.     The transfer of the case to PLB 7254, including the change in the carrier file numbers, did not prejudice Mr. Kite in any way.  Had the transfer not happened, Mr. Kite's case would have remained in limbo, without a resolution on the merits.  The transfer of the case to PLB 7254 was therefore a benefit to Mr. Kite, not a detriment.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 14

1    18.    For the same reasons that the transfer of Mr. Kite's case to PLB 7254 was not

2    corrupt, Mr. Peterson's agreement to hear the case and his subsequent decision on the merits was

3    not corrupt under § 153 First (q).  It is not "corruption" for an arbitrator to issue a decision on a

4    case presented to him.  In this case, both sides asked Mr. Peterson to hear the Kite matter, and he

5    was authorized by the parties' arbitration agreement to issue his ruling sustaining the discharge

6    decision.

7    19.    Plaintiffs' other secondary arguments lack merit.  First, Mr. Peterson did not

8    engage in fraud or corruption by considering evidence that went beyond the "on-property"

9    record.  An arbitrator's evidentiary rulings are not subject to review absent a showing of bad

10   faith, and there is no indication that Mr. Peterson's evidentiary rulings were made in bad faith.

11   *United Paperworkers v. Misco, Inc.*, 484 U.S. 29, 39-40 (1987) (citing *John Wiley & Sons, Inc.*

12   *v. Livingston*, 376 U.S. 543, 557 (1964)).  Moreover, the PLB agreement that governed the

13   proceedings before PLB 7254 did not limit the record to the on-property proceedings; it

14   permitted the arbitrator to consider anything submitted by the parties.  Nor is it clear from Mr.

15   Peterson's award that it depended on anything from outside the on-property record.  To the

16   contrary, the award recited references to the earlier positive test that were indisputably in the on-

17   property investigation record.

18   20.    Second, Mr. Peterson did not fraudulently fail or refuse to consider Plaintiffs'

19   procedural arguments.  Arbitrators are not required to give their reasons for an award, and so

20   certainly are not required to address every argument made by a party.  *United Steelworkers of*

21   *America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no

22   obligation to the court to give their reasons for an award.").  In any event,  Mr. Peterson more

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 15

1    than adequately addressed any contention by the Plaintiffs that Mr. Kite's case was not properly

2    before PLB 7254.

3         21.    Both Law Boards (7204 and 7254) were presented with substantial evidence of

4    Mr. Kite's first (May 5, 1997) and second (January 17, 2005) violations of the drug and alcohol

5    policy.  But for a misunderstanding in Ms. Zimmerman's mind about a possible settlement

6    agreement between the parties, the dispute would have been resolved with finality.  The actions

7    of Mr. Boldra in chastising Ms. Zimmerman, if intemperate in tone, was nevertheless a

8    reasonable response to the situation.  There was no corruption in the process of moving the

9    dispute from the Zimmerman Board to the Peterson Board.  The eventual decision from the

10   Peterson Board is a valid decision and is **AFFIRMED**.  Judgment is in favor of BNSF.

11   IT IS SO ORDERED.

12        Dated this 24th day of September, 2015.

13

14                                              Ronald B. Leighton

15                                              Ronald B. Leighton
                                                United States District Judge

16

17

18

19

20

21

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 16